# United States Court of Appeals for the Federal Circuit

2007-1188


ATLANTA ATTACHMENT COMPANY,

Plaintiff-Appellee,

v.


LEGGETT & PLATT, INCORPORATED,

Defendant-Appellant.


Douglas D. Salyers, Troutman Sanders, LLP, of Atlanta, Georgia, argued for plaintiff-appellee. With him on the brief was Jeffrey C. Morgan.

Theodore R. Remaklus, Wood, Herron & Evans, L.L.P., of Cincinnati, Ohio, argued for defendant-appellant.

Appealed from: United States District Court for the Northern District of Georgia

Judge Orinda D. Evans

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

2007-1188

ATLANTA ATTACHMENT COMPANY,

Plaintiff-Appellee,

v.

LEGGETT & PLATT, INCORPORATED,

Defendant-Appellant.

Appeal from the United States District Court for the Northern District of Georgia in case no. 1:05-CV-1071, Judge Orinda D. Evans.

_____

DECIDED: February 21, 2008
_____

Before MAYER, DYK and PROST, Circuit Judges.

Opinion for the court filed by Circuit Judge MAYER. Concurring opinion filed by Circuit Judge PROST, in which Circuit Judge DYK joins.

Leggett & Platt, Inc. appeals the judgment of the United States District Court for the Northern District of Georgia granting Atlanta Attachment Co. summary judgment that Leggett & Platt infringed claim 32 of U.S. Patent No. 6,834,603, and that the patent was neither invalid because of the on-sale bar of 35 U.S.C. § 102(b), obviousness, or a violation of the best mode and written description requirements, nor unenforceable due to inequitable conduct. Atlanta Attachment Co. v. Leggett & Platt, Inc., No. 1:05-CV-1071 (N.D. Ga. Feb. 23, 2007). Because embodiments of claim 32 of the '603 patent were on sale before the critical date, we reverse and remand.

BACKGROUND

Commercial sewing machine manufacturer Atlanta Attachment Co. developed the instant invention in response to a request from Sealy, Inc. to create an automatic gusset ruffler machine. The two agreed that if successful, Sealy would patent the invention, and Atlanta Attachment would sell only to Sealy. They further executed an agreement that Atlanta Attachment would keep the development confidential, although there was no obligation for Sealy to do the same. Both companies stated at trial that they verbally agreed to keep the development confidential. Atlanta Attachment developed a total of four prototypes which they presented for sale to Sealy along with offers to sell production models. Each prototype was sent to Sealy in succession, embodying improvements over the predecessor prototype. Atlanta Attachment claims that they earned no profit from these sales.

The first and second prototypes were quoted to Sealy in April of 1999 and January of 2000. Both prototype sales orders included quotations for sales of subsequent machines. Upon delivery, both prototypes were tested at Sealy's secure facilities, and Sealy made no commercialized products with the machines. Both prototypes required significant operator control. The first required the operator to control the ruffler and determine when the pleats were created, while the second could detect where to create a ruffle, but could only make the ruffle when commanded by the operator. Sealy gave Atlanta Attachment verbal comments about their necessary requirements on both machines, and then returned them to Atlanta Attachment.

Atlanta Attachment sent Sealy a quotation for a third prototype in September of 2000, and further sales orders were created for this machine on November 30, 2000,

and February 5, 2001.  Sealy paid this last invoice. Instead of receiving it at their own facilities, Sealy representatives inspected the machine at Atlanta Attachment's facilities on February 7, 2001. This prototype adjusted sewing speeds without operator intervention, recognized the corner of a panel and automatically turned on the ruffling function and turned off the ruffler when complete.

The final prototype was delivered to Sealy on April 10, 2001, after the critical date of March 5, 2001.  This prototype was substantially similar to the third prototype, the exception being the use of a pneumatic piston instead of an eccentric drive to control the pleat generator, and controlling the pleat generator independently of the sewing machine.  Sealy experimented with this prototype until June of 2001, at which time improvements were made in light of the experimentation.

Ultimately, Sealy decided not to purchase machines from Atlanta Attachment, allowing Atlanta Attachment to seek sales elsewhere.  On August 15, 2002, Atlanta Attachment filed U.S. Patent Application No. 10/219,837 for an "Attachment gusset with ruffled corners and system for automated manufacture of same," claiming priority to Provisional Application No. 60/362,025, filed March 5, 2002.  The 10/219,837 application yielded U.S. Patent No. 6,834,603 ("'603 Patent"), issued on December 28, 2004.  The patent is directed at a machine that automatically attaches a gusset to a panel of a pillowtop mattress, rotating the panels at the corners, and pleating the corners of the gusset.

Atlanta Attachment filed suit alleging that Leggett & Platt's GPT-1000 series sewing machines infringed claim 32 of the '603 patent:

> 32. A system for attaching a gusset to a panel, comprising:
> a. a gusset forming station for automatically forming the gusset from a

strip of gusset material;

  b. a sewing table having an upper surface supporting the panel as the gusset is attached thereto;

  c. a sewing machine adjacent the upper surface of the sewing table, positioned along sewing path for the panel, for attaching the gusset to the panel;

  d. a pleat generator for forming at least one pleat in the gusset at a desired location about the panel, said pleat generator operated in timed relation with said sewing machine, sewing the gusset to the panel; and

  e. a system controller controlling a sewing operation for attaching the gusset to the panel, wherein said system control can control the sewing of the gusset to the panel at varying rates to enable high speed sewing of the gusset to the panel and sewing at a different rate for generation of the pleats in the gusset as needed.

Leggett & Platt responded that their machines do not infringe claim 32, and that claim 32 is invalid due to the on-sale bar, failing to satisfy the best mode and written description requirements, and obviousness, and the '603 patent is unenforceable due to inequitable conduct.

The district court construed the claim terms and by summary judgment held that the Leggett & Platt machines did infringe claim 32. Addressing the counterclaims, the district court determined that claim 32 was not invalid because the three pre-critical date prototypes were not on sale, because none of the pre-critical date prototypes reduced the limitations of claim 32 to practice, and because the prototype sales were experimental uses. The district court also held that Leggett & Platt had not proved a violation of the best mode or written description requirements, nor had it shown that claim 32 was obvious. Finally, the district court found no inequitable conduct because since the three prototypes were experimental and not disclosed to the public, they need not have been disclosed to the U.S. Patent and Trademark Office during prosecution.

Leggett & Platt appeals and we have jurisdiction under 28 U.S.C. § 1295(a)(1).

DISCUSSION

We review a district court's grant of summary judgment <u>de novo</u>. <u>Bose Corp. v. JBL, Inc.</u>, 274 F.3d 1354, 1358 (Fed. Cir. 2001). "Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." <u>Vanmoor v. Wal Mart Stores, Inc</u>, 201 F.3d 1363, 1365 (Fed. Cir. 2000). Summary judgment is improper "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, all of the nonmovant's evidence is to be credited, and all justifiable inferences are to be drawn in the nonmovant's favor. <u>Id.</u> at 255, 106 S.Ct. 2505.

Our patent laws deny a patent to an inventor who applies for a patent more than one year after making an attempt to profit from his invention by putting it on sale. 35 U.S.C. § 102(b); <u>see also</u> <u>Elizabeth v. Am. Nicholson Pavement Co.</u>, 97 U.S. 126, 137 (1877). An invention is so barred when it was both the subject of a commercial offer for sale before the critical date and ready for patenting at the time of the offer. <u>Pfaff v. Wells Elecs, Inc.</u>, 525 U.S. 55, 67, 199 S.Ct. 304, 311-12 (1998).

The overriding concern of the on-sale bar is an inventor's attempt to commercialize his invention beyond the statutory term. <u>Netscape Commc'ns. Corp. v. Konrad</u>, 295 F.3d 1315, 1323 (Fed. Cir. 2002). When the asserted basis of invalidity is an on-sale bar, the court should determine whether the subject of the barring activity met each of the limitations of the claim, and thus was an embodiment of the claimed invention. <u>Id.</u> (quotations removed). We focus on the third prototype because it contains each element of claim 32. (We reach whether each element was reduced to

practice <u>infra</u>, in discussing the second <u>Pfaff</u> prong.)

To meet the first, commercial offer, prong, the offer must be sufficiently definite that another party could make a binding contract by simple acceptance, assuming consideration. <u>Netscape</u>, 295 F.3d at 1323. In determining such definiteness, we review the language of the proposal in accordance with the principles of general contract law. <u>Id.</u> The law has long recognized a distinction between experimental usage and commercial exploitation of an invention. While "[a]ny attempt to use [an invention] for profit . . . would deprive the inventor of his right to a patent," an inventor's use "by way of experiment" does not bar patentability. <u>Elizabeth</u>, 97 U.S. at 137 (1877). Therefore, we must consider whether the suspect activities were experiments as opposed to an attempt to profit from the invention, that is, whether the primary purpose of the offers and sales was to conduct experimentation. <u>Allen Eng'g Corp. v. Bartell Indus.</u>, 299 F.3d 1336, 1354 (Fed. Cir. 2002). Neither profit, revenue, nor even an actual sale is required for the use to be a commercial offer under section 102(b) – an attempt to sell is sufficient if it rises to an offer upon which a contract can be made merely by accepting it. Although the third prototype was never actually delivered to Sealy, it was indeed sold to Sealy because Atlanta Attachment sent Sealy an invoice for the machine (an offer), and Sealy paid for the machine (an acceptance).

Atlanta Attachment responds that its sales to Sealy were experimental, because they were prototypes submitted to determine if the invention fit Sealy's requirements. However, experimentation conducted to determine whether the invention would suit a particular customer's purposes does not fall within the experimental use exception. <u>Allen Eng'g</u>, 299 F.3d at 1355 (citing <u>In re Theis</u>, 610 F.2d 786, 792 (CCPA 1979)).

Therefore, we are interested only in the actions of *Atlanta Attachment* (and not Sealy's experiments) in determining whether the machine was suitable to the purpose of the invention.

Additionally, Leggett & Platt is correct to emphasize that Atlanta Attachment did not retain control over the prototypes when they were in Sealy's possession. While we have held that control *may* not be the lodestar test in all cases, we have also said that it is important, and sometimes dispositive. Electromotive Div. of Gen. Motors Corp. v. Transp. Sys., 417 F.3d 1203, 1213 (Fed. Cir. 2005) (citing In re Hamilton, 882 F.2d 1576 (Fed. Cir. 1989)). In Allen Engineering, we simply catalogued a set of factors that previous cases had found instructive, and in some cases dispositive, for determining commercial offers versus experimental uses. 299 F.3d at 1353. The issue of control is dispositive here, therefore we need not review each factor set out there. Atlanta Attachment was not experimenting within the contemplation of the experimental use doctrine when it sold its invention to Sealy because Sealy performed the testing and because Atlanta Attachment did not have control over the alleged testing to establish experimentation. See Electromotive Div., 417 F.3d at 1213. The fact that Sealy experimented with the prototypes is immaterial because the experimental use exception only concerns the actions of the inventors and their agents, and Sealy was not under the inventors' control.

The first Pfaff prong is also met, and experimental use negated, because Atlanta Attachment had presented a commercial offer for sale of the invention en masse. Atlanta Attachment gave a quotation to Sealy dated September 27, 2000, for 50 production units, with "anticipate[d] installation of Production units to begin no later than

March 2001." This offer occurred before the critical date of March 5, 2001. Furthermore, as Atlanta Attachment confirmed, the quotation became a contract with the signature of a purchasing entity. Therefore, this quotation constitutes an offer for sale that cannot avoid the on-sale bar via the experimental use exception. An offer to mass produce production models does not square with experimentation under any standard; it is commercial exploitation.

We now turn to the second Pfaff prong, ready for patenting. Contrary to Atlanta Attachment's argument, once there has been a commercial offer, there can be no experimental use exception. We also conclude that the third prototype was a reduction of claim 32 to practice, and therefore the invention was ready for patenting.

There are at least two ways to meet the ready for patenting prong: prior to the critical date the device was reduced to practice, or there is proof that "prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." Pfaff, 525 U.S. at 67-68. An invention is reduced to practice when it works for its intended purpose. Honeywell Int'l Inc. v. Universal Avionics Sys. Corp., 488 F.3d 982, 997 (Fed. Cir. 2007) (citing Eaton v. Evans, 204 F.3d 1094, 1097 (Fed. Cir. 2000)). An invention is said to work for its intended purpose when there is a demonstration of its workability or utility. Id. (citing Fujikawa v. Wattanasin, 93 F.3d 1559, 1563 (Fed. Cir. 1996)). Because the third prototype demonstrated the workability and utility of the invention of claim 32 during Atlanta Attachment's February 2001 demonstration to Sealy, claim 32 was reduced to practice, and thus ready for patenting.

The third prototype demonstrated its workability because the machine adjusted

sewing speeds without operator intervention, and appropriately at the corners of the panel (the desired locations) where it turned on the ruffler and attached a ruffled gusset corner. After passing the corner, it increased the speed again as intended.

Atlanta Attachment received comments from Sealy about the third prototype, and in response improvements to the prototype were included in a fourth prototype. The amount Sealy had paid for the third prototype was refunded upon delivery of the fourth prototype. The district court erred in concluding that these facts showed the third prototype was not suitable for its intended purpose. This is because an invention can be considered reduced to practice "even though it may later be refined or improved." New Railhead Mfg. L.L.C. v. Vermeer Mfg. Co., 298 F.3d 1290, 1297 (Fed. Cir. 2002). As to the "high speed" limitation of the system controller, the district court noted that the fourth prototype differed from the third in that the pleat generator was pneumatic driven instead of eccentric driven, and that the sole reason for the change was that the eccentric drive caused the machine to vibrate when operated at high speed. However, the court erroneously applied the reasoning of Electromotive Division, which said that an inventor is entitled to perfect claimed features as part of reducing the invention to practice. 417 F.3d at 1211. This refers to the applicability of the experimental use exception to the first prong of Pfaff, not whether or not an invention is reduced to practice. Consistent with the rule that later refinements do not preclude reduction to practice, it is improper to conclude that an invention is not reduced to practice merely because further testing is being conducted. Moreover, because vibration-free operation was not a claimed feature, it would only be relevant if the vibration actually prevented workability or utility of the invention. Atlanta Attachment has not presented such

evidence.

Atlanta Attachment also argues that the desired locations element was not reduced to practice in the third prototype because the pleat generator was coupled to the sewing head, limiting the machine to perform one ruffle and one stitch at a time. This it argues disallowed the placement of pleats in "desired locations" and multiple stitches per pleat ("timed relation"). However, claim 32 does not require an uncoupled pleat generator. The claim also does not require multiple stitches per pleat. In fact, the specification enables one pleat, one stitch operation. The district court construed the pleat generator element as "a device that generates a pleat in the gusset at a location about the panel where a pleat is wanted, in an operation timed with said sewing machine, sewing the gusset to the panel." Additionally, the specification of the '603 patent reads at column 4, lines 37-45: "The plunger assembly 446, in one embodiment, includes a pneumatic piston that is controlled so as to push the gusset material 314 into a ruffle when the needle 442 is in an 'up' position and to retract the ruffler foot 440 when the needle is in a down position." While improvements were possible and ultimately manufactured in the fourth prototype, these deficiencies in the third prototype did not prevent reduction to practice of the invention actually claimed. Therefore, because the third prototype was both the subject of a commercial offer for sale before the critical date and was reduced to practice at the time, claim 32 is invalid due to the on-sale bar of section 102(b).

Because the third prototype was on sale, we agree with Leggett & Platt that it was material to the examination. See Digital Control Inc. v. Charles Mach. Works, 437 F.3d 1309, 1318 (Fed. Cir. 2006) (noting that a reasonable examiner would have

considered the true nature of the invention's reduction to practice to be important in deciding to allow the claim). However, materiality does not presume intent. <u>Manville Sales Corp. v. Paramount Sys. Inc.</u>, 917 F.3d 544, 552 (Fed. Cir. 1990). The district court did not consider intent after deciding the third prototype was an experimental use, leaving this issue of fact unresolved. We therefore must remand the case for the district court to reconsider the allegation of inequitable conduct.

<u>CONCLUSION</u>

Accordingly, the judgment of the United States District Court for the Northern District of Georgia is reversed, and the case is remanded for further proceedings in accordance with this opinion.

<u>COSTS</u>

Costs to Leggett & Platt.

<u>REVERSED and REMANDED</u>

# United States Court of Appeals for the Federal Circuit

2007-1188

ATLANTA ATTACHMENT COMPANY,

Plaintiff-Appellee,

v.

LEGGETT & PLATT, INCORPORATED,

Defendant-Appellant.

Appeal from the United States District Court for the Northern District of Georgia in case no. 1:05-CV-1071, Judge Orinda D. Evans.

PROST, <u>Circuit Judge</u>, concurring, with whom DYK, <u>Circuit Judge</u>, joins.

I agree with the majority opinion and fully join it. I write separately, however, to point out the confusion in our caselaw regarding the applicability of the experimental use doctrine to the two prong test for the on-sale bar. The Supreme Court's decision in <u>Pfaff v. Wells Electronics, Inc.</u> redefined our test for the on-sale bar and affected how the experimental use doctrine applies to alleged instances of invalidating prior use. 525 U.S. 55 (1998). Without considering these issues in a comprehensive manner in future cases, we will never escape from the confused status of our current caselaw.

The Supreme Court in <u>Pfaff</u> introduced an explicit test for the on-sale bar. Specifically, it created the two prongs of commercial sale and "ready for patenting," and distinguished "ready for patenting" from reduction to practice. As to the second prong, the Court stated, "one can prove that an invention is complete and ready for patenting before it has actually been reduced to practice." <u>Id.</u> at 66. This court, following pre-<u>Pfaff</u> decisions, has stated on several occasions, post-<u>Pfaff</u>, that the experimental use

doctrine cannot provide an exception to the on-sale bar once an invention is reduced to practice. Cargill, Inc. v. Canbra Foods, Ltd., 476 F.3d 1359, 1371 (Fed. Cir. 2007) (quoting Allen Eng'g Corp. v. Bartell Indus., Inc., 299 F.3d 1336, 1354 (Fed. Cir. 2002) (quoting EZ Dock, Inc. v. Schafer Sys., Inc., 276 F.3d 1347, 1357 (Fed. Cir. 2002) (Linn, J., concurring))); Allen Eng'g, 299 F.3d at 1354 (quoting EZ Dock, 276 F.3d at 1357 (Linn, J., concurring)); New Railhead Mfg., LLC v. Vermeer Mfg. Co., 298 F.3d 1290, 1297, 1299 (Fed. Cir. 2002); EZ Dock, 276 F.3d at 1357 (Linn, J., concurring); Zacharin v. United States, 213 F.3d 1366, 1369 (Fed. Cir. 2000)

If we were to accept that reduction to practice eliminates availability of the experimental use doctrine as a whole, the continuing viability of that doctrine would exist only between the time an invention is ready for patenting and the time it is reduced to practice. Such a result would severely restrict the rights of inventors to conduct ongoing work on an invention; they could do so only in private without using outside resources that may be necessary. Private work that is primarily experimental would not trigger the on-sale or public use bars to patentability in the first place, and thus has no need for the experimental use doctrine.

Pfaff indicates that the experimental use doctrine should apply more broadly than the limited period suggested by a reduction to practice cutoff. First, the Pfaff Court explicitly discusses the experimental use doctrine as it relates to the first prong, offering it as an example of how an "inventor can both understand and control the timing of the first commercial marketing of his invention." 525 U.S. at 67. This statement confirms the ongoing viability of the experimental use doctrine under the Pfaff prongs, calling into

2007-1188                                    2

question the idea that the doctrine only applies during the limited time between when an invention is ready for patenting and when it is reduced to practice.

Further, the Court stated that "invention" as used in 35 U.S.C. § 102(b) "must refer to a concept that is complete, rather than merely one that is 'substantially complete,'" and that "one can prove that an invention is complete and ready for patenting before it has actually been reduced to practice." Id. at 66. Such statements minimize the relevance of a distinction between "ready for patenting" and reduction to practice, other than as relaxing evidentiary requirements for proving the on-sale bar. Indeed, if the justification for eliminating the experimental use exception upon reduction to practice comes from completeness of the invention—and therefore a lack of need for further experimentation—then the exception should also not apply to protect an invention ready for patenting, a proposition flatly contradicted by Pfaff.[1]

In other words, Pfaff suggests that the experimental use doctrine continues to provide a way for patentees to avoid invalidation through the on-sale bar. Because an invention is complete when it is either ready for patenting or reduced to practice, the experimental use doctrine must remain available after that stage. In my view, therefore, experimental use in this respect represents the counterpoint to commercial sale or public use. Assuming a complete invention, ready for patenting, inventors should be able to continue to privately develop any claimed aspect of that invention without risking

---

[1] Use of the phrase "experimental use exception" does not imply that the experimental use doctrine is a free-standing doctrinal exception to a statutory bar; the experimental use doctrine is more accurately characterized as a negation of a statutory bar. EZ Dock, 276 F.3d at 1351 (noting that "[t]his court has repeatedly stressed that evidence of experimental use does not give rise to a free-standing doctrinal exception to statutory bars, but instead operates to negate application of section 102(b)").

invalidation, if they conduct development activities in a way that is neither public nor simply commercial, even if there is some commercial benefit to the inventor in connection with the experimental use.[2] Such development should fall under the post-Pfaff application of the experimental use doctrine, and should be protected if it satisfies the first prong of Pfaff—i.e., it is neither a simply commercial offer for sale nor a public use.

When the inventor conducts a commercial transaction in order to facilitate development, but the development activity meets the requirements of the experimental use doctrine, the inventor avoids the on-sale bar. This exception to the on-sale bar does not evaporate upon reduction to practice. In essence, just as inventors could develop any aspect of the invention privately, they may employ the concepts of agency and confidentiality to also accomplish the same result.

In the present case, as the majority opinion demonstrates, Atlanta Attachment cannot use the experimental use doctrine to avoid the first prong of the on-sale bar because it did not demonstrate experimental, rather than simply commercial, purposes for the sale. Similarly, the quote for fifty "production unit" machines separately demonstrates an offer to sell with simply commercial intent. Both the sale and offer to sell conclusively demonstrate satisfaction of the first Pfaff prong. The experimental use doctrine is inapplicable.

---

[2] The experimental use doctrine would apply if the use or sale was primarily experimental. See, e.g., Electromotive Div. of Gen. Motors Corp. v. Transp. Sys. Div. of Gen. Elec. Co., 417 F.3d 1203, 1210 (Fed. Cir. 2005) ("[W]e observe that the first prong of the Pfaff test entails an assessment of whether the circumstances surrounding a pre-critical date sale objectively show that it was primarily made for experimentation.").

While the experimental use doctrine, as such, is not pertinent to the second <u>Pfaff</u> prong, an inventor's experimentation may have relevance to that prong. As to the second prong, a patentee may still avoid the on-sale or public use bars by proving that the "invention" required additional experimentation, and was not in fact complete. Such a showing parallels the pre-<u>Pfaff</u> experimental use doctrine, but instead of involving an exception to the on-sale or public use bars, takes effect as merely avoiding the ready for patenting prong in the first place. Experimentation of this type must concern claimed aspects of the invention, because those aspects control whether the invention is ready for patenting or not.

In the present case, Atlanta Attachment's argument that the third prototype did not work for its intended purpose attempts to avoid the second <u>Pfaff</u> prong. As the majority opinion demonstrates, however, because all of Atlanta Attachment's arguments concern unclaimed features, they cannot avoid the conclusion that the third prototype was a reduction to practice and therefore met the second <u>Pfaff</u> prong.